UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                         :

KENNETH HANSEN,                     :
                                         :

               Plaintiff,        :
                                         :           24-CV-2808 (JMF)

        -v-                 :
                                         :        <u>OPINION AND ORDER</u>

CITY OF NEW YORK et al.,        :
                                       :

              Defendants.    :
                                       :
-------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      Plaintiff Kenneth Hansen was a police officer in the New York City Police Department

("NYPD") from 2004 until his termination in 2021. He brings this action against the City of

New York (the "City") and several NYPD employees for discrimination on the basis of his

military status and retaliation in violation of the Uniformed Services Employment and

Reemployment Rights Act ("USERRA"), 38 U.S.C. §§ 4301, *et seq.*; New York Military Law

("NYML"), N.Y. Mil. Law §§ 242, *et seq.*; New York Civil Service Law ("NYCSL"), N.Y. Civ.

Serv. Law §§ 88; New York Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290, *et seq.*;

and New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107. *See* ECF

No. 22 ("Compl.").[1] Defendants now move, pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure, to dismiss. *See* ECF No. 27. The Court concludes that Hansen fails to state a

claim under USERRA and the NYML and declines to exercise supplemental jurisdiction over his

---

[1]     The individual Defendants are: Hansen's commanding officers, Christopher Catechis, Jason Huerta, and Louron Hall; the NYPD Assistant Deputy Commissioner of Trials, Paul Gamble; and the former NYPD Commissioner, Dermot F. Shea.

remaining state and local law claims.  Accordingly, and for the reasons that follow, Defendants'
motion is GRANTED.

## BACKGROUND

The following facts, drawn from the operative Amended Complaint (the "Complaint"),
are assumed to be true for purposes of this motion.  *See, e.g.*, *DiFolco v. MSNBC Cable L.L.C.*,
622 F.3d 104, 111 (2d Cir. 2010).

Hansen joined the NYPD as a police officer in July 2004.  *See* Compl. ¶ 17.  At the time,
he was a member of the U.S. Armed Forces.  *Id.* ¶ 18.  He continued to serve in the military
throughout his employment with the NYPD in accordance with procedures laid out in the NYPD
Patrol Guide during periods of military leave.  *Id.* ¶ 19.  Hansen alleges that his "military and
police duties posed no conflict for either employer" until 2009, when he returned from a stint
with the Air National Guard and "received a negative performance evaluation based in part upon
his not having issued summonses or conducted apprehensions at the same rate as Police Officers
who had been present for full-time employment in the precinct during the same time period."  *Id.*
¶¶ 19-20.  When he refused to "accept and sign" the negative 2009 evaluation, Hansen's
immediate supervisors — Officers Christopher Catechis and Jason Huerta — refused to prepare
performance evaluations for 2010 or 2011.  *Id.* ¶ 22.  The lack of performance evaluations for
those years rendered Hansen ineligible for promotions.  *Id.*

More broadly, Hansen alleges that Catechis waged "a campaign of harassment" against
him due to his military status.  *Id.* ¶ 21.  In September 2012, for example, Catechis called Hansen
a "piece of sh*t" and a "liar"; Catechis also told Hansen to watch his back and to "shut the f*ck
up" because Catechis "did not believe that Hansen and his partner had been issuing summonses,
causing their response to a radio call to be delayed."  *Id.* ¶ 31 (asterisks in original).  The
Complaint alleges that Catechis engaged in "petty harassment of Hansen on a daily basis,"

including changing Hansen's mealtime to the earliest possible time, ordering Hansen to take out the precinct garbage, and assigning Hansen to a fixed post, which reduced Hansen's ability to satisfy productivity metrics such as summonses issued and apprehensions made. *Id.* ¶¶ 38-39.

Hansen alleges that when he left for active military duty between August 2010 and March 2011, and then again between October 2011 and May 2012, Catechis and Huerta "claim[ed] that they thought Hansen was pretending to be on military service" and contacted Hansen's military supervisors to confirm that he was under military orders. *Id.* ¶¶ 22-23.  After Hansen returned to the NYPD in May 2012, he applied to work in the Intelligence Division, but his application was denied "based on his lack of performance evaluations for 2010 and 2011." *Id.* ¶ 26.  Around the same time, Hansen also requested a transfer to a different precinct or to change his tour of duty; these requests were denied as well.  *Id.* ¶ 24  Huerta informed Hansen that he "would never be approved for a tour change because no daytime supervisor wanted an officer who was so frequently activated for federal service" — a statement that was "later confirmed by [Policemen's Benevolent Association] Delegate John Towmey on September 16, 2012, who informed Hansen that both Catechis and another Lieutenant, Lt. King, refused to move him to daytime tour of duty because of his service-connected absences."  *Id.* ¶ 25.  Hansen alleges that he was also "regularly denied overtime opportunities . . . due to his being 'absent' too often."  *Id.* ¶ 27.  Finally, he alleges that, in November 2012, while on active military duty in connection with Hurricane Sandy, Huerta marked Hansen as Absent Without Official Leave ("AWOL").  *Id.* ¶ 35.  Huerta later rescinded the AWOL designation, however, after he received confirmation from the Air National Guard that Hansen had been serving in the military at the time.  *Id.*

Hansen alleges that he "made repeated efforts to address this unacceptable situation through administrative channels, beginning with filing complaints with his supervisors, both individually and through his union representation."  *Id.* ¶ 29.  When these efforts did not succeed,

Hansen approached the NYPD's Equal Opportunity Employment ("EEO") Office but was told that discrimination based on military status was outside of the EEO's jurisdiction. *Id.* ¶¶ 29-30. The EEO did eventually open an investigation when Hansen's mother sent a letter to Huerta complaining about Catechis's treatment of her son, but the investigation was closed after the EEO concluded that discrimination "based on [] military status did not rise to the level of employment discrimination under Title VII." *Id.* ¶ 33. Hansen subsequently filed two complaints with the United States Department of Labor ("DOL"), Veterans Employment and Training unit ("VETS"). *Id.* ¶¶ 34, 36, 43-46. The first complaint was closed because Hansen did not file the requisite paperwork. *Id.* ¶ 34. In response to Hansen's second complaint, filed in May 2013, the NYPD expunged two Command Disciplines on his record and agreed to review the NYPD's Patrol Guide provisions and its policies regarding Definite Military Leave. *Id.* ¶ 45. Hansen claims that, after lodging these complaints, he "experienced a brief respite from the ongoing harassment while Catechis was temporarily reassigned" to a different precinct, but "the harassment began again" when Catechis returned in January 2014. *Id.* ¶ 46.

Between 2015 and 2018, Hansen and his then-wife, Angela Cappozello, had altercations on three separate occasions, each of which resulted in Cappozello filing a Domestic Incident Report with the police. *Id.* ¶¶ 50-51, 64, 66-68. After two of these altercations, Cappozello also filed and obtained Orders of Protection against Hansen. *Id.* ¶¶ 53, 71. In June 2018, Hansen was arrested and charged with Criminal Mischief in the Fifth Degree and Harassment in the Second Degree. *Id.* ¶ 71. Although he received an Adjournment in Contemplation of Dismissal in August 2018, the NYPD transferred him to the Quartermaster Section where he remained on modified duty status while the NYPD explored disciplinary charges against him due to his arrest. *Id.* ¶¶ 77-82. While on modified duty status, Hansen was ineligible for overtime or promotion opportunities. *Id.* ¶ 82. In April 2021, the NYPD held a disciplinary trial in connection with the

three domestic incidents and Hansen's alleged failure to notify the NYPD about them. *Id.* ¶¶ 88, 100. At the conclusion of the trial, during which Cappozello "submitted a sworn affidavit declaring that her earlier claims of assault and property damage had been false," Hansen was found guilty of three counts of engaging in conduct prejudice of good order, discipline, and efficiency of the NYPD by engaging in domestic incidents, which included physical violence; three counts of failing to notify the NYPD that he had been involved in those domestic incidents; and one count of damage to property. *Id.* ¶¶ 91, 93; *see* ECF No. 28-5 (termination recommendation). In July 2021, Commissioner Shea approved a recommendation that Hansen be terminated, and Hansen was, in fact, terminated. *Id.* ¶ 106.[2]

## LEGAL STANDARDS

A Rule 12(b)(6) motion tests the legal sufficiency of a complaint. In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g.*, *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009). To survive a Rule 12(b)(6) motion against a defendant, a plaintiff must plead sufficient facts that, accepted as true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. A complaint that offers only "labels and conclusions" or "a formulaic

---

[2]    In November 2021, Hansen initiated an Article 78 proceeding in New York State Court challenging the outcome of his disciplinary trial and subsequent termination. *See* ECF No. 28-6. On September 16, 2022, the case was dismissed as time barred. *See* ECF No. 28-7.

recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 545. Further, if the plaintiff has not "nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id.* at 570.

## DISCUSSION

Defendants contend that Hansen fails to state a claim for military service discrimination, retaliation, or hostile work environment under USERRA. *See* ECF No. 28 ("Defs.' Mem."), at 16. The Court will begin with those claims before addressing Hansen's state and local claims.

## A. Discrimination in Violation of USERRA

The Court begins with Hansen's claim that Defendants discriminated against him on the basis of his military service in violation of USERRA. "The purpose of USERRA is to encourage military service by eliminating or minimizing the disadvantages to civilian careers." *Serricchio v. Wachovia Secs. LLC*, 658 F.3d 169, 174 (2d Cir. 2011) (internal quotation marks omitted). Most relevant here, USERRA protects members of the uniformed services, including those who are in the military reserves, *see Mock v. City of Rome*, 910 F. Supp. 2d 429, 430-31 (N.D.N.Y. 2012), from discrimination on the basis of their military service by providing that

> [a] person who is a member of, . . . has performed, . . . or has an obligation to perform service in a uniformed service shall not be denied . . . retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, . . . performance of service, . . . or obligation.

38 U.S.C. § 4311(a). The statute defines "a benefit of employment" as "the terms, conditions, or privileges of employment, including any advantage, profit, privilege, gain, status, account, or interest (including wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice." *Id.* § 4303(2). Notably, "an unfavorable entry on [a] plaintiff's personnel record . . . [is] not a denial of 'initial employment,

reemployment, retention in employment, promotion, or any benefit of employment,' as liability under USERRA requires." *Staub v. Proctor Hosp.*, 562 U.S. 411, 417-18 (2011).

Courts in the Second Circuit have held that a two-step burden shifting analysis applies to discrimination claims under USERRA. *See Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 529-30 (S.D.N.Y. 2017) (collecting cases). At step one, the employee has the burden of showing, by a preponderance of evidence, that his protected status was "a substantial or motivating factor in the adverse employment action." *Gummo v. Village of Depew*, 75 F.3d 98, 106 (2d Cir. 1996) (cleaned up). "Military status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration." *Lapaix v. City of New York*, No. 13-CV-7306 (LGS), 2014 WL 3950905, at *5 (S.D.N.Y. Aug. 12, 2014) (internal quotation marks omitted). This may be proved through "direct or circumstantial evidence, including an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses." *Id.* at *5 (alteration omitted). A motivating factor "is not necessarily the sole cause of the action, but rather it is one of the factors that a truthful employer would list if asked for the reasons for its decision." *Fink v. City of New York*, 129 F. Supp. 2d 511, 520 (E.D.N.Y. 2001) (internal quotation marks omitted). Moreover, "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is the proximate cause of the ultimate employment action, then the employer is liable under USERRA." *Staub*, 562 U.S. at 422. "Once the employee proves that his military status served as a motivating factor in the employer's adverse decision, the employer may nonetheless escape liability" at step two "by showing, as an affirmative defense, that it would have made the same decision without regard to the employee's protected status." *Woodard v. N.Y. Health & Hosps.*

*Corp.*, 554 F. Supp. 2d 329, 349 (E.D.N.Y. 2008) (internal quotation marks omitted).

Ultimately, to state a plausible USERRA claim and survive a motion to dismiss, a plaintiff must

plead "facts upon which it could plausibly be inferred that his military service or any protected

activity was a substantial or motivating factor in the adverse employment actions." *Hunt v.*

*Klein*, 476 Fed. App'x 889, 891 (2d Cir. 2012) (summary order) (cleaned up).

Importantly, Section 4311(a) of USERRA "is an anti-discrimination rule — its caption

reads 'Discrimination against persons who serve in the uniformed services and acts of reprisal

prohibited.'" *Sandoval v. City of Chicago*, 560 F.3d 703, 704 (7th Cir. 2009); *accord Crews v.*

*City of Mt. Vernon*, 567 F.3d 860, 866 (7th Cir. 2009) (observing that "courts have indicated that

the statute reaches only discriminatory employment actions that provide military employees with

fewer benefits" and collecting cases); *Rogers v. City of San Antonio*, 392 F.3d 758, 768 (5th Cir.

2004) (noting that "the brief legislative history of the bill that became § 4311(a) reflects no

intention to prohibit neutral labor contracts from treating employees on military leave equally

with those on non-military leave with respect to the loss of benefits due to the absence from

work"); *cf. Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367-68 (2001) (distinguishing

equal-treatment norms from accommodation requirements).  Thus, the statute requires employers

"to treat persons on military service the same as other employees," not "*better*."  *Sandoval*, 560

F.3d at 704-05.  Put differently, the statute "does not require accommodation, which is

fundamentally different from an equal-treatment norm." *Id.* at 705.

In this case, the Complaint is not entirely clear as to what actions are alleged to be the

basis of the USERRA discrimination claim.  The candidates are: (1) the negative performance

evaluation in 2009 and associated lost opportunities, Compl. ¶ 20; (2) the denial of overtime

opportunities, *id.* ¶ 27; (3) the denial of Hansen's requested transfer and shift changes, *id.* ¶¶ 24-

25; and (4) derogatory remarks, *id.* ¶ 21, being marked AWOL, *id.* ¶ 35, and "petty harassment," *id.* ¶ 38.[3]  The Court discusses each in turn.

First, the negative performance review in 2009 plainly does not support a claim because, as noted above, USERRA does not cover the making of "an unfavorable entry on [a] plaintiff's personnel record."  *Staub*, 562 U.S. at 417-18.  Hansen tries to get around that problem by resting on the claim that, as a result of the 2009 negative performance review — and his refusal to accept it — his supervisors declined to prepare performance reviews for him in 2010 and 2011, which in turn made him ineligible for promotions and a position in the NYPD's Intelligence Division.  But even assuming *arguendo* that the 2009 review was a "proximate cause" of these subsequent employment actions, *Staub*, 562 U.S. at 422 — a dubious premise — they would not support a claim anyway because Hansen does not allege that his military status was a "motivating factor" in his supervisors' entry of the 2009 negative performance review.  Instead, he alleges only that he "received a negative performance evaluation based in part upon his not having issued summonses or conducted apprehensions at the same rate as Police Officers who had been present for full-time employment in the precinct during the same time period."  Compl. ¶¶ 19-20.  He thus "seek[s] an accommodation rather than equal treatment," which Section 4311 of USERRA "does not require."  *Sandoval*, 560 F.3d at 705.

Hansen's next set of allegations — regarding overtime opportunities — suffers from the same fatal defect.  The Complaint alleges that "Hansen was regularly denied overtime

---

[3]    USERRA does not have a statute of limitations, *see Mock*, 851 F. Supp. 2d at 436 (citing 38 U.S.C. § 4327(b)), so Hansen's claims are not statutorily time barred even though some of the relevant conduct took place more than ten years ago, *see, e.g.*, *Nielsen v. J.C. Penny Co., Inc.*, No. 23-CV-5619 (JGLC) (JLC), 2024 WL 3518523, at *1 n.2 (S.D.N.Y. July 24, 2024). Defendants argue that the Court should dismiss pursuant to the doctrine of laches, *see* Defs.' Mem. 11-14, but the Court need not and does not reach the issue.

opportunities that were extended to other, less senior officers" because he was "'absent' too often — *i.e.*, while actively performing military service." Compl. ¶ 27. Here too, therefore, Hansen's grievance is with the NYPD's failure to accommodate his military service, not its denial of equal treatment. Thus, the denial of overtime opportunities due to attendance issues cannot, without more, give rise to a discrimination claim under USERRA.

Hansen's claim based on his denied requests for a precinct or shift change fares no better. He alleges that he "requested to be transferred to another precinct, or to change his tour of duty from night tours to day tours" on "multiple occasions," but the NYPD denied these requests based on his military-related absences. Compl. ¶ 24. But "[c]ourts have consistently held that a change in schedule, without more, is not an adverse employment action for purposes of a discrimination claim." *Royall v. City of Beacon*, No. 24-CV-3 (KMK), 2024 WL 4266546, at *14 (S.D.N.Y. Sept. 23, 2024) (cleaned up); *see, e.g.*, *Arroyo-Horne v. City of New York*, No. 16-CV-3857, 2018 WL 4259866, at *11 (E.D.N.Y. Sept. 5, 2018); *Smalls v. Allstate Ins. Co.*, 396 F. Sup. 2d 364, 371 (S.D.N.Y. 2005) ("[Neither] receiving [an] unfavorable schedule[] [n]or work assignment[] . . . rise[s] to the level of an adverse employment action[] because they do not have a material impact on the terms and conditions of [the] [p]laintiff's employment." (alterations omitted)); *Linell v. N.Y.C. Dep't of Educ.*, No. 15-CV-5085, 2018 WL 1611370, at *6 (E.D.N.Y. Mar. 30, 2018) ("[W]here assignments fall within the duties of a plaintiff's position, receiving unfavorable schedules . . . does not, without more, rise to the level of an adverse employment action."). To be sure, USERRA lists "the opportunity to select work hours or location of employment" as one example of a possible "benefit of employment." 38 U.S.C. § 4303(2). But Hansen does not allege any specifics about the circumstances of these requests or any details to suggest that NYPD officers are entitled to transfers other than his generic assertion that "similar tour changes" are "routinely granted." Compl. ¶ 24. He thus fails to allege that the requested

transfers constituted "privileges of employment" that "accrue[d] by reason of an employment contract or agreement or any employer policy, plan, or practice." 38 U.S.C. § 4303(2).  Without more, therefore, Hansen's allegations surrounding the denial of his transfer requests do not state a discrimination claim.

That leaves Hansen's myriad allegations regarding derogatory remarks, "petty harassment," and receipt of an AWOL designation.  These allegations can be swiftly dismissed. For one thing, none involves the denial of "a benefit of employment." 38 U.S.C. § 4311(a).  The alleged remarks made by Hansen's commanding officers, for example, did not themselves deprive him of "the terms, conditions, or privileges of employment." *Id.* § 4303(2).  Similarly, Hansen's allegations of "harassment" on Catechis's part, *see* Compl. ¶¶ 38-39, consist of petty slights that did not amount to reductions in his overall employment responsibilities, *see, e.g.*, *Lambert v. Trump Int'l Hotel & Tower*, 304 F. Supp. 3d 405, 420 (S.D.N.Y. 2018) (noting, in the Title VII context, that "not every unpleasant matter short of discharge or demotion constitutes an adverse action" and that an actionable action must be "more disruptive than a mere inconvenience" (internal quotation marks omitted)).  And although Hansen alleges that an AWOL designation may have "negative consequences not only in a personnel record, but in terms of lost pay," the Complaint does not allege that Hansen himself actually suffered any such consequences as a result of his AWOL designation, which was rescinded after Huerta confirmed his military service.  Compl. ¶ 35.  In any event, even assuming that some of these allegations concern "a benefit of employment," Hansen pleads no non-conclusory allegations of discriminatory motive.  Hansen does not dispute, for instance, that "it is generally appropriate for an employer to inquire about and request documentation for military leave."  Defs.' Mem. 23 (citing *O'Connell v. Town of Bedford*, No. 21-CV-170 (NSR), 2022 WL 4134466, at *12 (S.D.N.Y. Sept. 12, 2022)).

In the final analysis, the allegations in the Complaint, taken as true, certainly support a conclusion that Hansen was treated poorly, perhaps even unfairly, by his supervisors. But like Title VII, USERRA "does not set forth 'a general civility code for the American workplace.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998)). Ultimately, Hansen fails to state a claim for discrimination on the basis of his military status in violation of USERRA because he either fails to plausibly allege an adverse employment action or fails to allege sufficient facts to establish that his military status was a motivating factor in any adverse action. Accordingly, Hansen's federal discrimination claims must be and are dismissed.

## B. Retaliation in Violation of USERRA

Hansen's federal retaliation claims under USERRA fall short as well. In addition to prohibiting acts of discrimination, USERRA bars an employer from "tak[ing] any adverse employment action or other retaliatory action against any person because such person . . . has taken an action to enforce a protection afforded any person under this chapter." 38 U.S.C. § 4311(b). To make out a *prima facie* case of retaliation under USERRA, "a plaintiff must show that (1) he was engaged in protected activity; (2) that the employer was aware of that activity; (3) that the plaintiff suffered an adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action." *Kassel*, 272 F. Supp. 3d at 537 (internal quotation marks omitted). More specifically, a service member claiming retaliation under Section 4311(b) must show that he suffered a "materially adverse" employment action "such as termination, demotion accompanied by a loss of pay, or a material loss of benefits or responsibilities that significantly alters the terms [or] conditions of his employment." *Gross v. PPG Indus., Inc.*, 636 F.3d 884, 892 (7th Cir. 2011) (quotation omitted); *see Croft v. Village of Newark*, 35 F. Supp. 3d 359, 370 (W.D.N.Y. 2014). He also "must demonstrate that [his]

exercise of [his] USERRA rights was a motivating factor in [the defendant's] action, unless [the defendant] can prove that the action would have been taken in the absence of [the plaintiff's] USERRA complaints." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (cleaned up); *see also Lisdahl v. Mayo Foundation*, 633 F.3d 712, 720 (8th Cir. 2011) (same); *Croft*, 35 F. Supp. 3d at 377-78.

Here, there is no dispute that Hansen's allegations satisfy the first and second elements of a *prima facie* case of retaliation.  Specifically, Hansen alleges that he (and his mother) submitted two EEO complaints (the first at an unspecified time around May 2012 and the second in September 2012) and that he submitted two complaints to DOL/VETS (the first on October 22, 2012, and the second in or about May 2013).  *See* Compl. ¶¶ 30-44.  And Hansen plainly alleges that Defendants were aware of these protected activities.  *See id.* ¶¶ 29, 39, 45.  His claims founder, however, on the third and fourth elements of the *prima facie* case requirement.  He alleges that Defendants engaged in fifteen discrete acts of retaliation, *see* Compl. ¶ 155, but these acts either do not qualify as adverse employment actions or he fails to allege a causal connection between the protected activity and the acts.

For starters, several of the alleged acts of retaliation appear to have predated Hansen's first EEO complaint in 2012.  Indeed, although Hansen does not specify exactly when the first EEO complaint was filed, the Complaint alleges that Hansen first "approached" the EEO office *after* the events surrounding his 2009 negative evaluation, accusations from his supervisors accusing him of lying about military service, the denial of his requests for precinct and shift transfers, the denial of his application for a position in the Intelligence Division, the denial of overtime opportunities, and Hansen's use of sick leave to address "the ongoing stress and harassment at his NYPD command."  *See* Compl. ¶¶ 20-30.  These events — which correspond to the first four of Hansen's asserted acts of retaliation, *see id.* ¶ 155 (acts (a) through (d)) —

cannot form the basis for a retaliation claim because, by definition, conduct "that preceded []

protected activity . . . could not have been in retaliation for acts not yet taken." *Gregory v. Daly*,

243 F.3d 687, 701 (2d Cir. 2001); *see also Forrest v. N.Y.C. Hous. Auth.*, No. 22-CV-6480

(JLR), 2023 WL 3203646, at *8 (S.D.N.Y. May 2, 2023) ("A plaintiff may not base her claim of

retaliation upon complained-of-acts that predated her speaking out because such a claim lacks a

causal nexus between the retaliation and protected activity." (cleaned up)).

      The majority of Hansen's remaining asserted acts of retaliation fail to support his claim

for the opposite reason: In the absence of other facts that could support an inference of causation,

they took place too long after Hansen's protected activity.  Specifically, nine of the alleged acts,

*see* Compl. ¶ 155 (acts (g) through (o)), concern actions taken by Defendants in relation to

Hansen's domestic altercations, spanning from the Charges and Specifications filed against

Hansen on November 1, 2016, through his eventual termination on July 9, 2021.  *See id.* ¶¶ 58-

106.  But these actions occurred over three years after Hansen's last protected activity, his May

2013 DOL/VETS complaint.  Although the Second Circuit has instructed that there is no "bright

line to define the outer limits beyond which a temporal relationship is too attenuated to establish

a causal relationship between" the protected conduct and the allegedly retaliatory action, *Summa*

*v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013), outer-bound cases are typically measured in

months, not years, *see, e.g.*, *Alvarado v. Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763,

785 (S.D.N.Y. 2019) (observing that, "although courts have found that . . . a seven-month gap

between the protected conduct and retaliatory action may be on its own too attenuated to give

rise to an inference of but-for causation, courts have also concluded that gaps of seven and eight

months may support a sufficient temporal connection if accompanied by other indicia of

retaliatory motive" (cleaned up)); *O'Connell*, 2022 WL 4134466, at *15 (finding, in a USERRA

action, that adverse actions eight to eleven months after protected activity, "without more, do[]

not sufficiently allow for an inference of causation"); *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 n.5, 6 (2d Cir. 2001) (citing cases in which a time lag of a year or more defeats an inference of causation). Wherever the outer limit may be, these acts far exceed it. Accordingly, the events surrounding Hansen's domestic altercations and his eventual termination plainly do not state a claim for retaliation under USERRA.

Only two allegedly retaliatory acts fall in a zone that, based on temporal proximity alone, could conceivably support a claim: Defendants' "[i]ncessant harassment, including meal time changes," and "[r]epeated efforts to embarrass Plaintiff or harm his position within his military unit by contacting his commanding officers and other high-ranked military personnel." Compl. ¶ 155 (acts (e) and (f)). But these acts no more qualify as adverse actions for purposes of Hansen's retaliation claim than they did for purposes of his discrimination claim. As the Court previously explained, they amount only to petty slights that did not reduce Hansen's overall employment responsibilities. *See, e.g.*, *Crews v. City of Mt. Vernon*, 567 F.3d 860, 869-70 (7th Cir. 2009) (holding that "petty" "disparaging comments" do not satisfy USERRA's "materially adverse" retaliation standard); *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 981-82 (7th Cir. 2008) (concluding that a supervisor's comments that expressed frustration with employees' taking medical leave, but that resulted in no loss of job benefits, were not materially adverse). In other words, these allegedly retaliatory acts are not "materially adverse" employment actions because they did not involve "a material loss of benefits or responsibilities that significantly alter the terms or conditions of [Hansen's] employment." *Kassel*, 272 F. Supp. 3d at 537.

Hansen's sole rejoinder is to assert, without much elaboration, that the Supreme Court's recent interpretation of Title VII in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), "may be instructive in USERRA claims as well." ECF No. 31 ("Pl.'s Mem."), at 20. In *Muldrow*, the Court held that Title VII's prohibition on "discriminat[ing] against" an individual "with respect

to the terms or conditions of employment" does not require a showing that "the harm incurred was 'significant.'" 601 U.S. at 354-55 (cleaned up). *Muldrow* may well have implications for the law governing USERRA moving forward, but it does not change the Court's analysis in this case for at least two reasons. First, the Court in *Muldrow* expressly confined its reasoning to Title VII's discrimination provision, leaving intact "Title VII's separate anti-retaliation provision," which "applies only when the retaliatory action is 'materially adverse,' meaning that it causes 'significant' harm," 601 U.S. at 357 — the exact same adverse action standard that applies to retaliation claims under USERRA. And second, *Muldrow* confirms that to make out a Title VII discrimination claim, a plaintiff must still "show some harm respecting an identifiable term or condition or employment." *Id.* at 354-55. Hansen's allegations do not even meet that lower bar. Indeed, if "an unfavorable entry on [a] plaintiff's personnel record . . . [is] not a denial of . . . any benefit of employment" for USERRA purposes, *Staub*, 562 U.S. at 417-18 (internal quotation marks omitted), it is hard to imagine how either a rescheduled mealtime or a supervisor's request for confirmation of active military service "leave[s] [Hansen] worse off respecting employment terms or conditions," *Muldrow*, 601 U.S. at 355.[4]

In sum, Hansen's claims for retaliation under USERRA must be and are also dismissed.

## C. Hostile Work Environment in Violation of USERRA

Finally, contrary to Hansen's assertion in his memorandum of law, *see* Pl.'s Mem. 21, the Complaint does not actually allege any claim of hostile work environment under USERRA. Indeed, his forty-one-page Complaint uses the phrase "hostile work environment" only five times, solely in reference to how Defendants discriminated and retaliated against him, *see*

---

[4]    For this reason, *Muldrow* does not affect the Court's analysis of, and conclusions with respect to, Hansen's discrimination claim under USERRA either.

Compl. ¶ 32 (describing how Hansen's mother "sent a letter to Huerta protesting the hostile work environment"); *id.* ¶ 124 (noting that Hansen used sick leave to "escape from the persistent hostile work environment"); *id.* ¶ 143 (alleging that Defendants "discriminated . . . against Plaintiff by denying him" employment "free from a hostile work environment"); *id.* ¶ 155 (describing "acts of retaliation" including the denial of shift change requests "to escape the hostile work environment" and "[f]orcing Plaintiff to take sick time as the only possible remedy for the hostile work environment"). Moreover, while the Complaint lists separate counts for discrimination and retaliation under USERRA, it lacks a standalone hostile work environment claim. *See id.* ¶¶ 139-56. It is axiomatic that "a party is not entitled to amend its complaint through statements made in motion papers." *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998). Thus, the Court need not even consider Hansen's purported hostile work environment claim. *See, e.g.*, *Karnauskas v. Columbia Sussex Corp.*, No. 09-CV-7104 (GBD), 2012 WL 234377, at *6 (S.D.N.Y. Jan. 24, 2012) (declining to consider a "claim [that] does not appear anywhere in plaintiff's amended complaint" because plaintiff "has not made a short and plain statement giving [defendants] fair notice of a cause of action . . . and is therefore not entitled to now seek relief on the basis of such a claim").

In any event, even if the Complaint did include a hostile work environment claim, it would fail as matter of law. For starters, it is unclear whether a USERRA hostile work environment claim is even a thing. *See Kassel*, 272 F. Supp. 3d at 541 (discussing "courts' uncertainty in this arena"); *but see Hughes v. City of New York*, 20-CV-3341 (AMD) (RLM), 2021 WL 7542440, at *6 & n.8 (E.D.N.Y. Aug. 25, 2021) (acknowledging "uncertainty" but explaining why USERRA "properly is read as recognizing hostile work environment claims"). And if it is, Hansen's allegations would fall far short of stating a claim in any event. In analyzing hostile work environment claims under USERRA, courts have "incorporate[d] the

standards and case law used to evaluate hostile work environment claims under Title VII." *Montoya v. Orange Cnty. Sheriff's Dep't*, 987 F. Supp. 2d 981, 1016 (C.D. Cal. 2013) (collecting cases); *Kassel*, 272 F. Supp. 3d at 541.  That means a plaintiff must plead facts that would tend to show that the complained of conduct "(1) is objectively severe or pervasive — that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [military status]." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (cleaned up).  A work environment's hostility is assessed based on the totality of the circumstances, which includes "the frequency of discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

Applying those standards here, the Court concludes that any hostile work environment claim would fail.  In opposing the motion to dismiss, Hansen states without support that he "raised multiple instances of conduct that, taken together, are sufficient to establish a hostile work environment," but apart from a bare string citation to the Complaint, he fails to elaborate what those "instances" are.  Pl.'s Mem. 21.  And in any event, Hansen's allegations, even taken together, are neither objectively severe nor pervasive enough — if they are traceable to his military service at all — to support a hostile work environment claim.  *See* Defs.' Mem. 25-26 (observing that "Plaintiff's claims are not sufficiently continuous, connected, or severe" and

comprise "petty slights and trivial inconveniences that do not constitute a hostile work environment").

Any claim for hostile work environment under USERRA is therefore dismissed as well.

**D.  State and Local Claims**

That leaves Hansen's claims under state and local law, namely the NYML, NYCSL, NYSHRL, and NYCHRL.  *See* Compl. ¶¶ 157-176.  A district court "may decline to exercise supplemental jurisdiction over [a pendent state law claim] if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  The statute does not create "a mandatory rule to be applied inflexibly in all cases."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).  Nevertheless, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Id.*; *see also Kolari v. N. Y.-Presbyterian Hosp.*, 455 F.3d 118, 123 (2d Cir. 2006) (reversing a district court decision to retain supplemental jurisdiction over state law claims after dismissal of the federal claim, citing "the absence of a clearly articulated federal interest"); *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."); *Anderson v. Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 147 (E.D.N.Y. 2015) ("In the interest of comity, the Second Circuit instructs that absent exceptional circumstances, where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should abstain from exercising pendent jurisdiction." (citing cases) (internal quotation marks omitted)).

Despite the general presumption, the Court concludes that judicial economy calls for exercising supplemental jurisdiction over Hansen's NYML discrimination claim because the

standards for evaluating it are the same as the standards for evaluating his USERRA discrimination claim. *See Caines v. City of New York*, No. 13-CV-676 (VEC), 2015 WL 13021892, at *6 (S.D.N.Y. July 8, 2015); *Wang v. N.Y. State Dep't of Health*, 40 Misc. 3d 747, 754 (N.Y. Sup. Ct. 2013) (noting that the NYML "is substantively and textually similar to USERRA and is intended to serve the same remedial objective"). That is, given the Court's decision on Hansen's USERRA claims, "it would be the height of inefficiency to defer a decision on [his NYML] claim to a state court." *Nunez v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 14-CV-6647 (JMF), 2017 WL 3475494, at *4 (S.D.N.Y. Aug. 11, 2017); *accord Avery v. DiFiore*, No. 18-CV-9150 (JMF), 2019 WL 3564570, at *5 (S.D.N.Y. Aug. 6, 2019). Instead, Hansen's NYML discrimination claim is also dismissed for the reasons discussed above.

By contrast, the Court declines to exercise supplemental jurisdiction over Hansen's other state and local claims because they are subject to different standards and must be analyzed separately. There is no dispute that is true for the claims under the NYSHRL and the NYCHRL. *See, e.g.*, *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (observing that "a plaintiff's discrimination claims under both the NYSHRL and the NYCHRL are subject to the burden-shifting analysis applied to discrimination claims under Title VII"). Defendants argue that "[t]he standard for recovery under" Section 88 of the NYCSL "parallels USERRA." Defs.' Mem. 17. But they do not cite, and the Court has not found, any cases to support that proposition. Instead, Defendants rely on the text of the state law, which provides that employees "shall be afforded full enforcement rights under the laws of this state and of the United States, including the Federal Uniformed Services Employment and Reemployment Rights Act of 1994" — *i.e.*, USERRA. N.Y. Civ. Serv. § 88. That language certainly guarantees that NYCSL is at least as protective as USERRA when it comes to discrimination based on military status, but it does not follow that the two are equivalent. Without more, "and because the law governing claims under the

[NYCSL] is still developing," Hansen's NYCSL claims present questions "best left to the courts of the State of New York." *Nunez*, 2017 WL 3475494, at *4 (internal quotation marks omitted).

Thus, with respect to Hansen's claims under the NYCSL, NYSHRL, and NYCHRL, this *is* the proverbial "usual case" in which the balance of relevant factors "point toward declining to exercise jurisdiction." *Carnegie-Mellon Univ.*, 484 U.S. at 350 n.7. Hansen's "federal-law claims were eliminated on a motion to dismiss, prior to the investment of significant judicial resources, and [the Court] can discern no extraordinary inconvenience or inequity occasioned by permitting the claims to be refiled in state court where they will be afforded a 'surer-footed reading of applicable law.'" *Kolari*, 455 F.3d at 123-24 (quoting *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966)); *see Brief v. Albert Einstein Coll. of Med.*, 423 Fed. App'x 88, 92-93 (2d Cir. 2011) (summary order) (affirming dismissal of the plaintiff's federal claims and declining to decide his claims under state and city law on the ground that they were "arguably governed by different legal standards" and the relevant law of New York was "still developing"). Accordingly, the Court declines to exercise supplemental jurisdiction over Hansen's state and local claims under the NYCSL, NYSHRL, and NYCHRL.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED, albeit without prejudice to Hansen refiling his claims under the NYCSL, NYSHRL, and NYCHRL in state court.[5] Additionally, the Court declines to *sua sponte* grant Hansen leave to amend the Complaint. Although leave to amend a pleading should be freely given "when justice so

---

[5]    Because the Court agrees with Defendants that Hansen fails to state a claim under USERRA and the NYML and declines to exercise supplemental jurisdiction over his other state and local claims, the Court need not and does not address Defendants' alternative grounds for dismissal.

requires," Fed. R. Civ. P. 15(a)(2), "it is within the sound discretion of the district court to grant or deny leave to amend," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Here, Hansen has neither sought leave to amend nor suggested that he possesses any additional facts that could cure the defects in his dismissed claims. *See, e.g.*, *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014); *Baptiste v. City Univ. of New York*, 680 F. Supp. 3d 415, 428 (S.D.N.Y. 2023) (declining to grant leave to amend in the absence of any suggestion that additional facts could remedy the defects in the plaintiff's pleadings). Furthermore, Hansen was on notice of Defendants' arguments when he filed the Complaint in response to Defendants' original motion to dismiss, and he was expressly warned that he would "not be given any further opportunity to amend the complaint to address issues raised by the motion to dismiss." ECF No. 21; *see Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first." (cleaned up)).

The Clerk of Court is directed to terminate ECF No. 27, to enter judgment in favor of Defendants consistent with this Opinion and Order, and to close the case.

SO ORDERED.

Dated: February 24, 2025
       New York, New York

_____
JESSE M. FURMAN
United States District Judge